(Reap. Dec. 8280)

S. S. KRESGE CO., INC. *v.* UNITED STATES

Entry Nos. 858222; 873138.

(Decided January 14, 1954)

*Sharretts, Paley & Carter* (*Howard C. Carter* of counsel) for the plaintiff.

*Warren E. Burger,* Assistant Attorney General (*Daniel I. Auster,* special attorney), for the defendant.

LAWRENCE, Judge: The two appeals for a reappraisement above enumerated have been consolidated for hearing and determination.

The subject merchandise consists of celluloid-covered thumb tacks, 50 pieces mounted on each board, imported from Germany.

The United States appraiser of merchandise made a report, as required by section 202 (a) of the Antidumpting Act of 1921 (19 U. S. C. §§ 160–171), pursuant to the finding of dumping of such merchandise from Germany (section 201 (a) of said act) which was proclaimed by the Secretary of the Treasury, September 12, 1933 (64 Treas. Dec. 216, T. D. 46615).

It is the contention of plaintiff herein that the provisions of the Antidumping Act, *supra,* do not apply to the thumb tacks in controversy for the reason that the purchase price is not less than the foreign market value. (Section 202 (a), *supra.*)

For ready reference the following statistics with regard to the merchandise in issue are tabulated.

| Appeal numbers | Invoiced and entered value | Appraised value | Alleged F. M. V. on dates of purchase and shipment | Alleged unit purchase price |
|---|---|---|---|---|
| 139136–A/02735 | RM 8.55, less 3% per gross boards | RM 8.55, less 3% per gross boards | RM 60.14 per 1,000 boards | RM 57.59 per 1,000 boards |
| 139137–A/02736 | " | " | " | RM 57.58 per 1,000 boards |

It will be observed that RM 8.55, less 3 per centum per gross boards, equals RM 57.59 per 1,000 boards, so that the alleged purchase price is the same as the invoiced, entered, and appraised values.

The pertinent provisions of the Antidumping Act, *supra,* are here set forth.

### DUMPING INVESTIGATION

SEC. 201. (a) That whenever the Secretary of the Treasury (hereinafter in this Act called the "Secretary"), after such investigation as he deems necessary, finds that an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation into the United States of a class or kind of foreign merchandise, and that merchandise of such class or kind is being sold or is likely to be sold in the United States or elsewhere at less than its fair value, then he shall make such finding public to the extent he deems necessary, together with a description of the class or kind of merchandise to which it applies in such detail as may be necessary for the guidance of the appraising officers.

### SPECIAL DUMPING DUTY

SEC. 202. (a) That in the case of all imported merchandise, whether dutiable or free of duty, of a class or kind as to which the Secretary has made public a finding as provided in section 201, and as to which the appraiser or person acting as appraiser has made no appraisement report to the collector before such finding has been so made public, if the purchase price or the exporter's sales price is less than the foreign market value (or, in the absence of such value, than the cost of production) there shall be levied, collected, and paid, in addition to the duties imposed thereon by law, a special dumping duty in an amount equal to such difference.

### PURCHASE PRICE

SEC. 203. That for the purposes of this title, the purchase price of imported merchandise shall be the price at which such merchandise has been purchased or agreed to be purchased, prior to the time of exportation, by the person by whom or for whose account the merchandise is imported, plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, less the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States; and plus the amount, if not included in such price, of any export tax imposed by the country of exportation on the exportation of the merchandise to the United States; and plus the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States; and plus the amount of any taxes imposed

in the country of exportation upon the manufacturer, producer, or seller, in respect to the manufacture, production or sale of the merchandise, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States.

### FOREIGN MARKET VALUE

SEC. 205. That for the purposes of this title the foreign market value of imported merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade for home consumption (or, if not so sold or offered for sale for home consumption, then for exportation to countries other than the United States), plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, except that in the case of merchandise purchased or agreed to be purchased by the person by whom or for whose account the merchandise is imported, prior to the time of exportation, the foreign market value shall be ascertained as of the date of such purchase or agreement to purchase. In the ascertainment of foreign market value for the purposes of this title no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account.

The record upon which these appeals were submitted to the court for decision consists of various documents.

On behalf of the plaintiff, there were received in evidence an affidavit of Erich Karrenberg, duly authenticated, as exhibit 1, and, as its exhibit 7, a subsequent affidavit of said Karrenberg, which discloses that the use of the word "cellophane" in exhibit 1 was inadvertent and that the word "celluloid" should have been used.

Defendant relies upon the following exhibits:

Exhibit 2, a report of Treasury Representative Charles Kruszewski, file 288/37, dated December 30, 1937.

Exhibit 3, a report of Treasury Representative Charles Kruszewski, file 158/36, dated July 20, 1936.

Exhibit 4, a report of Treasury Attaché Erwin G. May, file 158/36–B, dated April 28, 1937.

Exhibit 5, a report of Treasury Representative Charles Kruszewski, file 288/38–A, dated September 29, 1938.

Exhibit 6, a report of Assistant Treasury Attaché Paul Hermes, file 6/35–B, dated March 22, 1935.

The affidavit of Karrenberg (exhibit 1) is quoted in full, it being understood that the word "cellophane" should read "celluloid."

City of Schwelm
State of Northrhine-Westphalia
Germany

Erich Karrenberg, duly sworn, says

1. That he is General Manager of HANSA-WERK Ernst Berning, Wuppertal-Barmen, Germany, and has been with such firm from its start 1943.

2. That in the year of 1943 the firm of HANSA-WERK Ernst Berning, Wuppertal-Barmen, has been formed as a separate concern, taking over the assets, liabilities, equipment, and personnel of the metal small-ware department of Rafflenbeul, and that he has been General Manager of said division of Rafflenbeul for the past 20 years.

3. That as General Manager of said company, he is thoroughly familiar with the manufacture and sale of steel wire thumb tacks with cellophane covered heads, 50 pieces mounted on each board, which were manufactured by said company under his personal supervision during the year 1937.

4. That he is personally familiar with the sale of all kinds of thumb tacks in Germany, both for consumption in Germany and for exportation to the United States and other countries and that he knows from personal experience the ordinary course of wholesale dealings, the principal markets of Germany for the sale of all kinds of thumb tacks and the numbers of sales and quantities involved therein, and the price at which such sales were made.

5. That steel wire thumb tacks with cellophane covered heads, 50 pieces mounted on each board, were never at any time sold in Germany for consumption in Germany.

6. That steel wire thumb tacks with cellophane covered heads, 50 pieces mounted on each board, were freely offered for sale and were at all times during this period freely offered for sale in the usual course of trade to other countries.

7. That the principal markets of Germany for the sale of such thumb tacks for exportation to the United States and to other countries were Sonneberg, Berlin and Hamburg.

8. That the vast majority of sales at wholesale of such thumb tacks for exportation to the United States and to other countries were in quantities of thousand gross boards and more.

9. That the price at which said thumb tacks were freely offered for sale and were sold to all purchasers for exportation to the United States and to other countries in quantities of thousand gross boards and more in Sonneberg, Berlin and Hamburg, in the usual course of trade, was RM 8.55 per gross boards, less 3%, packing included.

10. That the price of RM 8.55 per gross boards, less 3%, packing included, was, in fact, the actual price paid by the S. S. Kresge Co. and was the amount received by Gust. Rafflenbeul for said thumb tacks.

11. That there is no export tax imposed by Germany on the exportation of said thumb tacks.

12. That no import duties have been rebated or not collected because of the exportation of said thumb tacks to the United States.

13. That no taxes were imposed on Gust. Rafflenbeul or any other person or company by reason of the manufacture, production or sale of the said thumb tacks, nor have any taxes been rebated or not collected, by reason of the exportation of said merchandise to the United States.

14. That the cost of all materials, fabrication, manipulation and other processes employed in manufacturing identical merchandise at all times preceding the dates of shipment, plus usual general expenses of more than 10% of the cost of materials, fabrication, manipulation and other processes of manufacture, plus the cost of all containers and coverings and all other costs, charges and expenses incident to placing the said thumb tacks in condition, packed ready for shipment to the United States, plus a profit of more than 8% of the sum of the cost of materials, fabrication as aforesaid, and the usual general expenses, as aforesaid (said profit being at least equal to that which is ordinarily added by other manu-

facturers of thumb tacks in Germany) is less than RM 8.55 per gross boards, less 3%, packing included.

A careful consideration of exhibits 2 through 6, introduced on behalf of the defendant, discloses nothing of substance to overcome the direct and positive proof contained in Karrenberg's affidavit (exhibit 1) presented by plaintiff.

Incorporated in defendant's brief is the statement—"These cases were tried on the same day as Reappt. 125792–A, etc., and the evidence in these cases is almost identical with the evidence offered therein."

The appeals for a reappraisement last referred to were the subject of decision by the writer of this opinion in the case of *S. S. Kresge Co.* v. *United States*, 28 Cust. Ct. 672, Reap. Dec. 8127, which was affirmed on appeal to the third division of this court in *United States* v. *S. S. Kresge Co.*, 30 Cust. Ct. 645, A. R. D. 24, from which no further appeal was taken. The question of law therein determined is likewise controlling of the present case.

A review of the record here presented discloses that the weight of competent evidence establishes that there is no legal foundation for the assessment of an antidumping duty in this case; that the purchase price, as defined in section 203 of the Antidumping Act, *supra*, is not less than the statutory foreign market value, as defined in section 205 of said act; and that the purchase price is not less than the cost of production, as defined in section 206 of said Antidumping Act (19 U. S. C. § 165).

Accordingly, I find as facts:

1. That the merchandise the subject of appeals for a reappraisement 139136–A and 139137–A consists of steel wire thumb tacks with celluloid-covered heads, 50 pieces mounted on each board, exported from Germany in the year 1937;

2. That such merchandise was not offered for sale nor sold in the principal markets of the country from which exported in the usual wholesale quantities and in the ordinary course of trade for home consumption;

3. That during the year 1937 such merchandise was freely offered for sale in the usual course of trade to all purchasers for exportation to the United States and to other countries;

4. That the principal markets of Germany for the sale of such merchandise for exportation to the United States and to other countries were Sonneberg, Berlin, and Hamburg;

5. That the usual wholesale quantity in which such merchandise was sold at wholesale was 1,000 gross boards;

6. That at the time of purchase and on the dates of exportation, such merchandise was freely offered for sale and was sold to all purchasers in the principal markets of Germany, in the usual wholesale

quantities and in the ordinary course of trade, not only for exportation to the United States but to other countries as well, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, at RM 8.55, less 3 per centum per gross boards;

7. That the price of RM 8.55, less 3 per centum per gross boards, was the actual price paid by the importer herein and was the amount received by the manufacturer;

8. That the purchase price, as defined in section 203, Antidumping Act of 1921, *supra*, is the same as the foreign market value on the date of purchase, as defined in section 205, *supra*.

Therefore, as matter of law, I conclude:

1. That the steel wire thumb tacks with celluloid-covered heads, 50 pieces mounted on each board, the subject of the appeals herein, are evaluated on the basis of export value, as defined in section 402 (d) of the Tariff Act of 1930 (19 U. S. C. § 1402 (d)); that said value is RM 8.55, less 3 per centum per gross boards; and that there is no higher foreign value;

2. That the purchase price, as defined in section 203 of the Antidumping Act of 1921, *supra*, is equal to the foreign market value on the date of purchase, as defined in section 205 of said Antidumping Act.

Judgment will be entered accordingly.